ROBERTSON, Justice,
for the Court:
The Mutual Life Insurance Company of New York (MONY) appeals from the judgment of the Circuit Court of the First Judicial District of Hinds County, Mississippi, entered against it and in favor of Mrs. Wanda (Austin) Douglas, for $317,786.30. The judgment was based on a jury verdict for $50,000, the face amount of an insurance policy on the life of her late husband, James D. Austin, and $250,000 punitive damages, plus $17,786.30 interest adjudged by the court.
On March 4, 1976, Wanda M. (Austin) Douglas, the widow of James D. Austin who died on January 8, 1972, filed her declaration in the Circuit Court of the First *1146 Judicial District of Hinds County, Mississippi, against The Mutual Life Insurance Company of New York; Caleb Dortch, Jr., its Jackson agency manager; and James R. Dewease, a field underwriter in the Jackson office.
Mrs. (Austin) Douglas alleged that MONY wrongfully refused to pay her insurance claim on the life of her husband, James D. Austin. She alleged that Dew-ease bound MONY with an oral contract of insurance on December 17, 1969, when Austin signed an application for a $50,000 whole life policy with waiver of premium and accidential death benefits; that unbeknown to Austin and her, Dewease switched a $50,000 whole life policy to an inferior $50,000 keyman policy and fraudulently had it dated March 1,1970, instead of December 17,1969; that the defendants failed to notify Austin within a reasonable time of MONY’s rejection of coverage by a whole life policy; and that the defendants are estopped to deny payment of the whole life policy and estopped to assert death of Austin by suicide within two years of March 4, 1970, the date of issue of the policy. Mrs. (Austin) Douglas demanded $50,000 actual damages and $1,000,000 punitive damages.
Appellant has assigned seven errors which it contends were committed in the trial of this case. The first assignment of error is:
The verdict of the jury and the judgment .rendered thereon are against the overwhelming weight of the evidence and contrary to the law, and the lower court erred in overruling defendant-appellant’s motion for a directed verdict, request for peremptory instruction, motion for judgment notwithstanding the verdict and motion for a new trial.
Because of the decision we have reached on this first assignment of error, it will not be necessary to discuss and decide the other six.
Austin, on December 17, 1969, signed an application to MONY for a whole life insurance policy in the face amount of $50,000, together with accidental death benefits and waiver of premium. His wife, Wanda Moore Austin, was designated the sole beneficiary, and also the owner of the policy.
Just above Austin’s signature on the application form were these printed words:
“I agree that: (1) No one but the Company’s President, a Vice-President or Secretary has authority to accept information not contained in the application, to modify or enlarge any contract, or to waive any requirement. (2) Except as otherwise provided in any conditional receipt issued, any policy issued shall take effect upon its delivery and payment of the first premium during the lifetime of each person to be insured. Due dates of later premiums shall be as specified in the policy.” (Emphasis added).
No receipt (conditional or otherwise) was issued.
On the back of this application, under the heading “FIELD UNDERWRITER’S CERTIFICATION”, Dewease, the salesman and field underwriter, requested that MONY also issue a keyman policy with waiver of premium and double indemnity.
Dewease made an engagement with Dr. Howard C. Friday, MONY’s Jackson physician, for a medical examination of Austin on December 17, 1969. Dr. Friday found albumin in the urine and slightly elevated blood pressure. The albumin indicated that probably something was wrong with his urinary tract system, and Dr. Friday testified that you frequently see elevated blood pressure with kidney disease. Dr. Friday put him in the hospital as a private patient on December 21, 1969, for a renal biopsy and further tests. Austin was released from the hospital on December 24th with a final diagnosis of chronic glomerulonephri-tis.
Theodore Topaban, the chief underwriter for MONY in the home office in New York City, received Austin’s application and the Medical Examiner’s Report (a part of the application) on December 22,1969. Dr. Friday reported slightly elevated blood pressure and 3-plus albumin in urine. The urine specimen was sent to home office. On December 23,1969, MONY’s home office *1147 wrote Dr. Friday requesting additional blood pressure readings and an additional urine specimen.
On January 6th, 1970, MONY’s home office received a call from Dr. Friday informing them of Austin’s hospitalization from December 21 to 24,1969, for a renal biopsy, that the biopsy showed “probable chronic glomerulonephritis.” Dr. Friday agreed to send a hospital summary and another blood pressure reading when Austin comes back to his office in a week or two.
On February 2, 1970, Topaban requested MONY’s Jackson office to secure an additional blood pressure reading and urine specimen. On February 10, 1970, Topaban notified the Jackson office that he was suspending further action on Austin’s file because he had not yet received the additional blood pressure reading and urine specimen.
On February 12, 1970, MONY’s home office received the requested additional urine specimen and blood pressure reading, and this was turned over to Mr. Topaban on February 19, 1970.
On February 13, 1970, Dewease (after learning of the suspension of Austin’s file by the home office) delivered the $97.00 refund check to Austin.
On February 24, 1970, after consultation with the medical department, Topaban approved a special Class IV rating for Austin. This meant that a higher premium would be charged to cover the risk, and that neither waiver of premium nor accidental death benefits would be available. On February 26, 1970, the home office approved the issuance of a $50,000 whole life policy for a monthly premium of $140, and also approved the issuance of a $50,000 keyman policy for a monthly premium of $111.49. The only difference between the two policies would be a quicker buildup of cash surrender value in the whole life policy because of the higher premium charged.
On February 26, 1970, Dewease went to Austin’s office a few floors below the MONY office in the First National Bank building, and explained the two policies that could be issued. Austin selected the keyman policy because of the lower premium. He returned to Dewease for cancellation the $97 refund check and gave Dew-ease a $14.49 check to cover the March, 1970, premium of $111.49. The $14.49 check was signed by Mrs. Wanda M. Austin.
Dewease requested the home office to date the two policies March 1,1970, in order to save Austin a month’s premium of $111.49.
On March 8,1970, when he received these two policies, both with the policy date of March 1, 1970, and the issue date of March 4, 1970, Dewease went down to Austin’s office on the fifth floor and again asked Austin which policy he wanted. Again Austin selected the keyman policy because of the lower premium. As he went over the policy provisions with Austin, Dewease red-lined the face amount, the annual premium, the Beneficiary (Mrs. Austin) Rights, Assignment, Incontestability and Suicide provisions. Only Austin was present at the February 26 and March 8, 1970, conferences. Dewease left the keyman policy with Austin.
Attached to and made a part of the policy was a copy of Austin’s original application dated December 17, 1969, and a copy of “AMENDMENT TO APPLICATION FOR LIFE INSURANCE.” This AMENDMENT, under the heading “PLAN” had this typed in:
“KEYMAN instead of WHOLE LIFE”. Under the heading “ADDITIONAL BENEFITS”, the policy contained this language:
“The benefit checked has not been issued:
(x) Waiver of Premium
(x) Accidental Death”.
Under the heading “CLASSIFICATION” appears this language:
“Policy issued:
(x) on Special Class basis with higher than standard premiums”.
Under the heading “MISCELLANEOUS” appears this typed-in language:
“DIVIDENDS APPLIED UNDER PROTECTION OPTION 8.”
A card styled “AUTHORITY TO HONOR PREMIUM CHECKS IN FAVOR OF *1148 THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK” was dated “2-26-70”, and signed by “Wanda M. Austin”. MONY drew monthly bank drafts under this authorization for premiums from April, 1970, until Austin’s death on January 8, 1972.
The keyman policy with endorsements and attachments remained in Austin’s possession from March 8, 1970, until April 30, 1970, when Mrs. Wanda M. Austin on that date executed a written assignment of the policy on a MONY printed form to Fred A. Waites, Hattiesburg, Mississippi, to secure a loan made to them. Her signature was witnessed by James Dewease and the key-man policy, together with the assignment, was sent to Waites by Dewease at Mrs. Austin’s request.
Mrs. (Austin) Douglas testified that she received the policy back from Fred Waites and that she and her husband assigned the keyman policy on September 27, 1971, to the First National Bank, Jackson, Mississippi, to secure a rather large loan. She testified that she delivered the policy and the assignment to the bank. She did not see the policy again until after her husband’s death.
After Austin’s death on January 8, 1972, claim was made on MONY for $50,000, the face amount of the policy. MONY refused to pay on the ground that Austin committed suicide within two years after the date of issue of the policy, and that this provision of the policy applied:
“SUICIDE — In event of the suicide of the Insured, sane or insane, within 2 years after the date of issue, the amount payable by the Company shall be limited to the amount of the premiums paid.” (Emphasis added).
On April 14, 1972, MONY issued its check to “WANDA AUSTIN AND FIRST NATIONAL BANK OF JACKSON MISSISSIPPI” in the sum of $2452.78, “the amount of the premiums paid”. Mrs. Austin refused to cash this check and on March 4, 1976, brought suit against MONY, Caleb Dortch, Jr., and James R. Dewease.
At the trial in July, 1976, Mrs. (Austin) Douglas testified that they were dissatisfied with a John Hancock Life Insurance policy issued in November, 1969, on Austin’s life because it was a rated policy with a monthly premium of $129.33. On cross-examination, Mrs. (Austin) Douglas testified:
“No, only that after this one we were I think more aware because we had been rated, and we were, you know, shopping for insurance; where at this time it was like — it was more important, I felt like, for us to replace it with a cheaper policy since we had this extra rating of $29.33 a month.”
MONY’s defense was that the insured, James D. Austin, committed suicide on January 8, 1972, and, the suicide being within two years after March 4, 1970, the date of issue of the policy, all they owed the beneficiary was the amount of premiums paid, $2,452.78, for which amount MONY had issued its check to Mrs. Austin on April 14, 1972.
The testimony was that Austin’s health deteriorated rapidly during the fall of 1970 and spring of 1971. He was not able to do any work after March, 1971. Tremendous medical bills were incurred. In September of 1971, both of his kidneys were removed and he had to go on a kidney dialysis machine three times each week from 6 p. m. to 6 a. m. A plastic tube was inserted in his left wrist so that he could be easily connected to the dialysis machine.
Austin would become excited when there was a possibility of receiving a kidney from an accident victim, but when the tissue-testing revealed that his body would reject that particular kidney he would become very depressed.
Austin drove from Jackson to Birmingham, Alabama, on Thursday, January 6, 1972, to visit his mother who, although 70 years of age, wanted to give one of her kidneys if Austin’s body would receive it. He was depressed when he left Jackson, and Austin’s mother, when contacted by Chief of Police Cox of Winfield, Alabama, after his death, told Cox that when he had left her Saturday afternoon he seemed real depressed.
*1149 Chief Cox testified by deposition that he had found Austin on the night of January 8, 1972, lying on the front porch of a little Methodist church in Winfield, Alabama, in a puddle of blood. When he found Austin his left arm was under him and Cox asked him who had done this to him. Austin replied: “I did it myself; leave me alone and let me die.” Cox turned Austin over and noticed that the plastic tube in his left wrist had been cut and blood was squirting out of it. Cox testified that he attempted to stop the flow of blood by holding the plastic tube. This is the way Cox explained it:
“A. I had to put my hand — excuse me, I had to put my foot on that hand, and I used my other arm to hold the tube. He was trying to resist me; and he was saying ‘Let me die; let me die’.”
Chief Cox rode in the ambulance with Austin to the hospital. Cox was questioned as to what happened in the ambulance:
“Q Was he conscious when you all arrived at the hospital, if you recall?
A Yes, sir, he was.
Q Did he have any conversation with you in the ambulance on the way to the hospital?
A He said several times to ‘Let me die.’ He said, ‘Leave me alone. Let me die.’ ”
Chief Cox stated that he left policeman Billy Joe Perry at the scene, and that Perry later came to the hospital and gave him a bloody razorblade that he had found just outside Austin’s car, which was parked in the church driveway. Chief Cox stated that he found more razorblades on the dashboard of Austin’s car.
Patrolman Perry testified by deposition:
“A He was just more or less wiggling around and trying to hide — I believe it was his left arm. He rolled over, I believe on his right side, and tried to cover his arm.
Q His left arm?
A His left arm.
Q Did you see any blood?
A Right. There was plenty of blood. He was laying in a pool of blood.
“Q What did Mr. Austin do when Mr. Cox touched him?
A Well, he tried to keep him away from that tube, you know, where he was on the kidney machine. He tried to keep him away from that.”
Perry testified as to what took place at the hospital:
“Q What doctors were there?
A There was a man and wife team. Now Dr. Fuson and his wife, and they were at the hospital at the time.
Q Okay, was Mr. Austin conscious at the hospital?
A Right.
Q Did you hear him say anything at the hospital?
A Yes, sir.
Q What did you hear him say?
A He said, ‘Let me die; let me die.’ He made that statement I would say three or four times at the hospital.”
Dr. Edna P. Fuson was called as a rebuttal witness by the plaintiff. She remembers Austin being brought into the emergency room but she doesn’t remember the date. Austin needed blood and she left the emergency room to give blood for him. Dr. Fuson was asked if Austin talked while she was in the emergency room. She replied:
“A The man was in severe shock. His pulse was thready. He was quite pallid, covered with perspiration; his respira-tions were shallow. As far as mental outlook, I have no idea. The man to my knowledge did not speak a word.
Q To your knowledge—
A And I feel I would remember that, as much as I remember about that case. If the man had said anything, I honestly feel I would have remembered it.”
[[Image here]]
“A To my knowledge, he did not speak.
Q Was he in a state of shock when you first saw him?
A Yes, he was. And the shock deepened when I rushed out and when they started taking my blood.
*1150 Q Now when you rushed out and they started taking your blood, what was his condition at that time that you stepped out of the room?
A I see no way on earth the man could have talked.”
Patrolman Perry had testified that Austin said “Let me die” three or four times while in the hospital, so to that extent Dr. Fuson’s testimony could be said to contradict Perry’s testimony.
After Austin’s death, a coroner’s jury was empanelled and the official certificate of death signed by the coroner on January 10, 1972, on file in the Bureau of Vital Statistics of the State of Alabama shows that the death was “Probably suicide.”
There was introduced as an exhibit to Mrs. (Austin) Douglas’s cross-examination a Claimant’s Proof of Death on a John Hancock Mutual Life Insurance Company form, which was signed by her on January 22, 1974, which Proof of Death, in answer to the question:
4. “d. If death resulted (1) from suicide, or (2) from homicide, state which.” was filled in “Suicide”.
Mrs. (Austin) Douglas contended at the trial that somebody in MONY’s office had signed her husband’s name to the Amendment to Application for Life Insurance form, which enabled MONY to switch policies on them and to issue a keyman policy rather than a whole life policy, that the keyman policy was inferior to the whole life policy, and that they had been thus defrauded.
There is no merit to this contention because the whole life policy and the keyman policy bore the same policy date, March 1, 1970, bore the same date of issue, March 4, 1970, were for the same face amount of $50,000, and both contained the same suicide clause providing:
“SUICIDE — In event of the suicide of the Insured, sane or insane, within 2 years after the date of issue, the amount payable by the Company shall be limited to the amount of the premiums paid.”
In addition to this, a copy of the Amendment to Application for Life Insurance was attached to and made a part of the keyman policy which policy was in the admitted possession of Mr. and Mrs. Austin from March 8 until April 30, 1970, when it was assigned to Fred Waites, then back in her hands on September 27, 1970, when it was assigned to the First National Bank and personally delivered by Mrs. Austin to the First National Bank.
The uncontradicted testimony of James Dewease was that Austin himself selected the keyman policy because of the lower premium required, and that he, Dewease, delivered the keyman policy to Austin on March 8,1970, and very carefully went over all of its terms, underlining with a red pencil in Austin’s presence many of the policy’s provisions. Dewease testified that Mrs. Austin was not present when Mr. Austin selected the keyman policy; neither was she present when Dewease explained in detail the terms and provisions of the selected policy.
The evidence of Austin’s committing suicide is overwhelming. It is undisputed unless it could be said that Dr. Edna Fuson’s testimony, that Austin in her opinion was not able to talk in the emergency room, tended to contradict the testimony of Policeman Perry that Austin said three or four times “Let me die” while in the emergency room. Even setting aside this particular testimony of Policeman Perry, in our opinion death by suicide was proved by clear and convincing evidence.
Austin died January 8, 1972; the policy date was March 1, 1970; the date of issue was March 4,1970; and the date of delivery March 8, 1970. His death was within the limiting two-year period of the suicide clause and under the plain provisions of that clause the amount payable by MONY was “limited to the amount of the premiums paid,” which MONY tendered to Mrs. (Austin) Douglas and the First National Bank, by its check dated April 14, 1972, in the amount of $2,452.78.
The evidence being clear and convincing that MONY had fully complied with the exact terms and provisions of its written *1151 contract of insurance with James D. Austin, the trial court should have granted the peremptory instruction requested by the defendants at the close of the evidence.
The judgment of the trial court is, therefore, reversed and judgment entered here for the appellant.
REVERSED AND RENDERED.
PATTERSON, C. J., SMITH, P. J., and SUGG, WALKER, BROOM and LEE, JJ., concur.
BOWLING, J., took no part.